UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TINA POTTS LINDROOS,

          Plaintiff,

    v.

DAVID BERNHARDT, et al.,

          Defendants.

Case No. 20-cv-06897-EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

Docket No. 25

      Plaintiff Tina Potts Lindroos has filed suit against the U.S. Department of Interior ("DOI") and Deb Haaland, the Secretary of the DOI, asserting claims for employment discrimination. Currently pending before the Court is Defendants' motion to dismiss. Defendants do not, at this time, challenge Ms. Potts Lindroos's sexual harassment/hostile work environment claim but do contest her claims for disparate treatment and retaliation.

      Having considered the parties' briefs as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion to dismiss.

## I.    <u>FACTUAL & PROCEDURAL BACKGROUND</u>

      Ms. Potts Lindroos was an employee of the National Park Service. *See* FAC ¶ 2. From May 2019 through November 2019, she worked at the Golden Gate National Recreation Area ("GGNRA") – specifically, the Muir Woods location – as a maintenance worker (WG-5). *See* FAC ¶ 15. (This appears to be a seasonal position.) Prior to that, she worked at Yosemite National Park. *See* FAC ¶ 13.

      Ms. Potts Lindroos's husband, John Lindroos, worked at Muir Woods in 2018, *i.e.*, the year before she started working there. *See* FAC ¶ 9. It was well known to Mr. Lindroos and

others working at Muir Woods, including supervisors, that another worker there, Mr. Isbell, was a

sexual harasser. *See* FAC ¶ 8. (Mr. Isbell was a permanent employee. *See* FAC at 6 n.2.) For

example:

> Mr. Isbell had signage placed on tools in the shop, giving the tools
> lewd names of sexual references such as "Beaver buster," which
> refers to a woman's private parts. Mr. Isbell actually made a label
> and put the names, such as "Beaver Buster" on the tools. . . .
> Everyone used the tools and everyone saw the names. Mr. Isbell
> made the combination of the shop "6969" – a sexual reference –
> something that he bragged about frequently. Mr. Isbell made
> numerous sexually suggestive comments on a daily basis . . . .

FAC ¶ 8.

Supervisors also tolerated other improper conduct by Mr. Isbell. For example, after a

coworker, John Ortez, reported Mr. Isbell to human resources regarding an incident, Mr. Isbell

started to call Mr. Ortez a rat. Mr. Isbell also hung a stuffed rat on a noose from his truck rearview

mirror and called the rat "JO" after Mr. Ortez. *See* FAC at 6 n.2 (indicating that the stuffed rat

was in the truck for over a year and a half).

When it became clear that Ms. Potts Lindroos would be working at Muir Woods in 2019,

Mr. Lindroos warned supervisors that Ms. Potts Lindroos would not tolerate Mr. Isbell's sexual

harassment. *See* FAC ¶ 9. Mr. Lindroos told one of the supervisors, Chris Rodriguez

(Maintenance Supervisor), about an incident between Ms. Potts Lindroos and a male coworker

while she was working at Yosemite National Park. *See* FAC ¶ 14. The male coworker had asked

inappropriate questions, and Ms. Potts Lindroos "informally asked that she and [he] be separated

so that [he] would not escalate and end up in trouble." FAC ¶ 13.

In response to this news, Mr. Rodriguez admitted to Mr. Lindroos that "Mr. Isbell was a

problem, but 'they wanted to work him and liked his chainsaw skills.'" FAC ¶ 12. Mr. Rodriguez

went on to tell the entire Muir Woods staff about the Yosemite incident and further

mischaracterized what had actually happened, claiming that Ms. Potts Lindroos was responsible

for having the male coworker fired. This caused Ms. Potts Lindroos's coworkers to avoid her

when she got to Muir Woods. *See* FAC ¶ 14.

On her first day at work at Muir Woods, May 19, 2019, Ms. Potts Lindroos was

immediately subjected to harassment by Mr. Isbell. For example, Mr. Isbell "continuously looked [her] up and down, staring at her." FAC ¶ 16. In addition, when Mr. Isbell showed her the truck she would be using for work – which she was to share with Mr. Ortez – he told her to watch out for Mr. Ortez because Mr. Ortez was a rat for having reported him to human resources. Mr. Isbell also told Ms. Potts Lindroos that "'[w]e don't like rats around here'" and showed her the stuffed rat with the noose on its neck. FAC ¶ 18. This was in effect a warning to Ms. Potts Lindroos not to report him, as he already knew about the Yosemite incident (apparently, because Mr. Lindroos had told him). *See* FAC ¶ 18.

Ms. Potts Lindroos told a supervisor, Matt Bayless (Maintenance Work Lead and acting Maintenance Supervisor), that first day about Mr. Isbell's harassing conduct – some of which Mr. Bayless had witnessed personally. However, his only response was to "'[j]ust try to avoid him.'" FAC ¶ 19. Mr. Bayless did not take any further action. *See* FAC ¶ 19.

A week later, Mr. Isbell engaged in further inappropriate conduct. He left a post-it note on a dry erase board in the shop at Muir Woods. The note was intended for Jack Beck, who had not yet started for work at Muir Woods as a seasonal worker. The note said: "'Jack me off.'" FAC ¶ 20. Mr. Bayless, one of the supervisors, participated in the harassment by giving Mr. Beck the note on his first day in front of his coworkers, including Ms. Potts Lindroos. *See* FAC ¶ 20.

In June 2019, Mr. Isbell continued to engage in inappropriate conduct. For example, the following all took place on June 9, 2019.

- Mr. Isbell made a number of sexual jokes about Mr. Beck while he was not present, asserting that Mr. Beck was a "'tranny'" (transvestite) and that he "'fucks men and women.'" FAC ¶ 22. Later, when Mr. Beck was present, Mr. Isbell asked Mr. Beck: "'Jack, is your dad the one who taught you how to fuck men too?'" FAC ¶ 22.

- Mr. Isbell commented to Mr. Bayless, a supervisor, that "someone in the office was chewing 'blow job gum.'" FAC ¶ 22.

- During lunch with Ms. Potts Lindroos, her husband, and another coworker at In-N-Out, Mr. Isbell "continually made inappropriate comments about women in the

3

restaurant, such as 'the other seats would have been better because you can see them (the other women) walk in and around the counter space, you can see them better.'" FAC ¶ 23.

- During a break, Mr. Isbell spoke with Ms. Potts Lindroos and made sexual comments about Mr. Beck – *e.g.*, calling him "'[J]ack me off,'" claiming that he "'gets off (masturbates) in his truck,'" and asserting that he was a transvestite and wanted to have sex with women and men. FAC ¶ 24.

- Mr. Isbell walked in during a conversation that Ms. Potts Lindroos was having with a coworker in which she stated that she "wrote [her son] a lot" since he was away at Marine Corps boot camp. FAC ¶ 25. Mr. Isbell interjected with a sexual comment: "'[Y]ou RIDE him a lot?'" FAC ¶ 25.

- During a conversation with Ms. Potts Lindroos, Mr. Isbell noted that her shoes had holes. Ms. Potts Lindroos stated, "'[W]ell, that's because I'm a working girl,' meaning [that] she works hard." FAC ¶ 26. Mr. Isbell responded – in front of others – "'[O]h a working girl[;] well in that case let me get my wallet out, [and] I'll pay you[.] [W]hat do you charge[?] We can do it right here.'" FAC ¶ 26.

On June 10, 2019, Ms. Potts Lindroos made a formal complaint against Mr. Isbell. *See* FAC ¶ 30. After she made her complaint, Mr. Rodriguez, one of the supervisors, told Mr. Isbell that he was not to have contact with Ms. Potts Lindroos. *See* FAC ¶ 31. Mr. Rodriguez later spoke to Ms. Potts Lindroos. When she asked about keeping Mr. Isbell separated from her, Mr. Rodriguez claimed that "he could only tell Mr. Isbell to not speak to her and have no contact." FAC ¶ 32. Mr. Rodriguez also stated that he wanted to work with Mr. Isbell. *See* FAC ¶ 34. Mr. Rodriguez further suggested that Ms. Potts Lindroos change her schedule or that she report to a different location so that she would not have to see Mr. Isbell (*i.e.*, instead of having Mr. Isbell change his schedule or location). *See* FAC ¶¶ 35-37. Only after Ms. Potts Lindroos began to cry did Mr. Rodriguez state that he "would send Mr. Isbell to Stinson Beach"; that Mr. Isbell "was not to venture any further than the shop at Muir Woods on workdays"; and that, "on Mondays, when [her] and Mr. Isbell's schedules overlapped, Mr. Isbell was to come in early and leave at 6:00

4

[a.m.]" so that Ms. Potts Lindroos could start at 6:15 a.m.  FAC ¶ 38.  Mr. Rodriguez promised that he would "come in at the same time as Mr. Isbell to make sure he was not going to hang around and bother her."  FAC ¶ 38.  However, Mr. Rodriguez also told Ms. Potts Lindroos that everyone would soon know about her complaint about Mr. Isbell.

Ultimately, Mr. Rodriguez did not follow through with his promise to come in at the same time as Mr. Isbell, and so Mr. Isbell would linger in the parking lot when Ms. Potts Lindroos arrived at work.  *See* FAC ¶ 38.  In addition, Ms. Potts Lindroos's coworkers did learn about her "turning in Mr. Isbell" shortly thereafter and shunned her.[1]  FAC ¶ 39.  *See, e.g.*, FAC ¶ 44 (alleging that coworkers ignored her calls for assistance).  Finally, after Ms. Potts Lindroos complained, Mr. Rodriguez retaliated by forcing her to "work her route by herself, without any assistance" – telling her husband that "'[s]he'll be by herself here so no one will offend her."  FAC ¶ 40.  All other crew members "had a partner and assistance was always available to them," except for Mr. Ortez,[2] and, when Ms. Potts Lindroos was out sick, her route was filled with two workers.  FAC ¶¶ 40, 43.  Ms. Potts Lindroos was isolated from coworkers as a result.  *See* FAC ¶¶ 40-41.  Ms. Potts Lindroos was also fearful that, working alone, she would be vulnerable to Mr. Isbell.  *See* FAC ¶ 45.

In late October 2019, Mr. Isbell violated the no contact order by calling her twice.  Ms. Potts Lindroos told Mr. Bayless, a supervisor, and asked if she could be released from her service early (one week prior to her end date) or if she could be put on paid or unpaid leave.  Mr. Bayless told her that she would have to resign if she wanted to leave.  Ms. Potts Lindroos thus continued to work through her end date (November 14, 2019).  Ms. Potts Lindroos also told Mr. Bayless that she wanted to file another complaint against Mr. Isbell, but Mr. Bayless refused.  *See* FAC ¶ 46.

---

[1] It is not entirely clear how the coworkers learned of this information – *e.g.*, from Mr. Rodriguez himself, from the fact that Ms. Potts Lindroos and Mr. Isbell were "separated," or from somewhere else.  There is some suggestion in the FAC that Mr. Rodriguez was responsible because he stated to Ms. Potts Lindroos that "everyone is going to know about this (her complaint about Mr. Isbell) by the end of the day."  FAC ¶ 39.  But at another point in the FAC, Ms. Potts Lindroos suggests that Mr. Bayless (another supervisor) told her coworkers that she had complained about Mr. Isbell.  *See* FAC ¶ 44.

[2] Notably, Mr. Ortez had also complained about harassment.  *See* FAC ¶ 43.

Subsequently, on her last day of work (November 14), Ms. Potts Lindroos told another supervisor, Sean Reynolds (Facility Manager), that she wanted to file a complaint against Mr. Isbell because he had violated the no contact order, but Mr. Reynolds was "noncommittal" and no investigation was ever initiated. FAC ¶ 49. In addition, Mr. Reynolds told Ms. Potts Lindroos that, instead of applying to return to GGNRA/Muir Woods, "she should try to get a job on the south side of the Bridge."[3] FAC ¶ 50.

In December 2019, Ms. Potts Lindroos initiated the EEO process with the DOI,[4] but no decision was ever issued (although a report of investigation was released in August 2020). *See* FAC ¶¶ 67-69.

In March 2020, Ms. Potts Lindroos was offered a "return job at Muir Woods" (she was "an automatic rehire per departmental policy"), but she was told that "there would be limited housing available to her" – which she asserts meant "she would have to get her own housing if she came back to Muir Woods." FAC ¶¶ 51, 53. This condition was specific to Ms. Potts Lindroos. *See* FAC ¶ 53. Furthermore, because the job would start in March instead of May, she "would not be eligible for rehire in 2021 and beyond." FAC ¶ 53. Finally, nothing was said about protecting her from Mr. Isbell who was still employed at the GGNRA. *See* FAC ¶ 53. Ms. Potts Lindroos thus declined the job offer. *See* FAC ¶ 53. After she declined the job offer, Mr. Isbell sent her five text messages with pictures. Ms. Potts Lindroos told Mr. Bayless and Mr. Reynolds, but nothing was done. *See* FAC ¶ 54.

In September 2020, Ms. Potts Lindroos filed a federal tort claim notice with the GGNRA,

---

[3] On his wife's last day of work, Mr. Lindroos also told another supervisor about Mr. Isbell violating the no contact order. That supervisor was Jerry Scheuneman. *See* FAC ¶ 55(c). Mr. Scheuneman likewise did nothing in response.

[4] According to the government, Ms. Potts Lindroos contacted an EEO counselor in December 2019 and a formal complaint was filed in March 2020. *See* Defs.' RJN; Blankenship Decl. ¶¶ 5-6 & Exs. A-B) (formal EEO complaint and counselor's report). The Court may take judicial notice of the EEO documents (not for the truth of their contents but for the fact that Ms. Potts Lindroos contacted the EEO office and made certain allegations). The EEO documents may also be considered under the incorporation-by-reference doctrine.

However, the Court may not take judicial notice of most of the documents submitted by Ms. Potts Lindroos (*e.g.*, Ms. Potts Lindroos's email exchanges with the EEO office and with supervisors and a declaration from Ms. Potts Lindroos).

but never received a response.  *See* FAC ¶ 70.

Based on, *inter alia*, the above allegations, Ms. Potts Lindroos has asserted four causes of

action:

> (1) Discrimination due to sex/gender in violation of 42 U.S.C. § 2000e-2(a).

> (2) Discrimination due to sex/gender in violation of 42 U.S.C. § 2000e-2(m).[5]

> (3) Retaliation due to whistleblowing in violation of § 2000e-3(a).

> (4) Harassment and hostile work environment due to sex gender in violation of §

> 2000e-2(a).

## II. DISCUSSION

A.  Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss

after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic

Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must

---

[5] Both § 2000e-2(a) and § 2000e-2(m) are discrimination claims.  The difference between the two is that § 2000e-2(a) uses the typical but-for standard while § 2000e-2(m) uses the mixed motive standard.  *See, e.g.*, *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015) ("The term 'because of' appears frequently in antidiscrimination laws.  It typically imports, at a minimum, the traditional standard of but-for causation.  Title VII relaxes this standard, however, to prohibit even making a protected characteristic a 'motivating factor' in an employment decision.") (citing §2000e-2(m)); *Adams v. Mem'l Hermann*, 973 F.3d 343, 352 (5th Cir. 2020) ("Title VII plainly provides for both a but-for causation standard and a mixed-motive standard.  It prohibits various adverse employment actions 'because of' an individual's protected status [in § 2000e-2(a)].  In contrast, Section 2000e-2(m) provides that 'an unlawful employment practice is established when the complaining party demonstrates that [a protected status] was a motivating factor for any employment practice, even though other factors also motivated the practice.'  Proof of causation under the 'motivating factor' standard is generally viewed as an alternative to the but-for standard."); *Fogg v. Gonzales*, 492 F.3d 447, 453 (D.C. Cir. 2007) ("On its face Title VII provides alternative ways of establishing liability for employment practices based upon the impermissible use of race or other proscribed criteria – one in § 2000e-2(a), which has been in the law since 1964, and another in § 2000e-2(m), which the Congress added in 1991 in response to the Supreme Court's decision in *Price Waterhouse*.  In *Price Waterhouse* the Court held that an employer could 'avoid a finding of liability [under § 2000e-2(a)(1)] … by proving that it would have made the same decision even if it had not allowed [an impermissible factor] to play' a role in its thinking.").

. . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

**B.** <u>Length of Opposition Brief</u>

As a preliminary matter, the Court notes that Ms. Potts Lindroos's opposition brief is more than 30 pages and thus exceeds the 25-page limit set by the Civil Local Rules. For purposes of this motion, the Court has considered the entirety of the opposition. However, Ms. Potts Lindroos is forewarned that, should she violate the Local Rules in the future, she risks being sanctioned – *e.g.*, the Court could strike the excess pages of the brief.

**C.** <u>Proper Defendant</u>

Defendants argue first that the DOI Secretary is the only proper defendant in this case – *i.e.*, the DOI itself should be dismissed. In her opposition, Ms. Potts Lindroos expressly states she "has no objection to dropping the Department of the Interior as a defendant, and leaving Deb Haaland, Secretary of . . . the Department of the Interior as the sole defendant." Opp'n at 32. Accordingly, the Court dismisses the DOI with prejudice.

**D.** <u>Punitive Damages</u>

Defendants argue next that the Court should dismiss the claim for punitive damages. In response, Ms. Potts Lindroos agrees that such damages "against the United States government are not allowed." Opp'n at 32. Accordingly, the Court dismisses the punitive damages claim with prejudice.

E.    Counts 1 and 2: Discrimination Based on Sex/Gender

    1.    More Definite Statement

Counts 1 and 2 are claims for disparate treatment (as opposed to a claim for harassment/hostile work environment which is pled in Count 4).  For a prima facie case of disparate treatment, a plaintiff must show the following: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated persons outside the protected class were treated more favorably.  *See Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000).

In the instant case, Defendants argue first that the Court should order a more definite statement for the disparate treatment claims because it is not clear from the FAC what the adverse employment actions are that serve as the predicates for the claims.  *See* Mot. at 8 (arguing that Ms. Potts Lindroos has left it to "Defendants and the Court to try to piece together the basis for these two claims from the preceding 70 paragraphs of factual allegations").

Although Defendants' argument is not without merit – *i.e.*, the face of the FAC does leave it to Defendants and the Court to guess what is the factual basis for the claims – the opposition brief has fleshed out what the factual theories are and, therefore, as Ms. Potts Lindroos suggests in her opposition, a more definite statement is unnecessary.  The Court agrees.

    2.    Alleged Discriminatory Acts

In her opposition brief, Ms. Potts Lindroos identifies "five discreet [sic] acts of discrimination in her FAC."  Opp'n at 20.  They are as follows:

        (1) She was "segregated by route for the entirety of the summer of 2019" – *i.e.*, she was forced to work by herself and without any partner.

        (2) She was not offered assistance or help from her coworkers (*e.g.*, when she called on the radio for help).

        (3) In late October 2019, Mr. Isbell violated the no contact order (set by Mr. Rodriguez) when he called her twice.

        (4) In November 2019 (specifically, on her last day of work), when she complained to Mr. Reynolds, a supervisor, about Mr. Isbell, she was told that, instead of applying

to return to GGNRA/Muir Woods, "she should try to get a job on the south side of the Bridge." FAC ¶ 50.

(5) In March 2020, she was offered a "return job at Muir Woods" but was told that "there would be limited housing available to her" – *i.e.*, "she would have to get her own housing if she came back to Muir Woods." FAC ¶¶ 51, 53. This condition was specific to Ms. Potts Lindroos. *See* FAC ¶ 53. Furthermore, because the job would start in March instead of May, she "would not be eligible for rehire in 2021 and beyond." FAC ¶ 53. Finally, nothing was said about protecting her from Mr. Isbell who was still employed at the GGNRA. *See* FAC ¶ 53.

Two of the above acts, however – specifically, (2) and (3) – are better characterized as acts of harassment/hostile work environment created by co-workers rather than as acts of disparate treatment initiated by supervisors. Indeed, in much of her opposition brief, Ms. Potts Lindroos glosses over the distinction between the hostile working environment and disparate treatment. For instance, Ms. Potts Lindroos refers to "[d]iscriminatory insults, epithets[,] and slurs" made by Mr. Isbell "during the entire summer of 2019," Opp'n at 18, which are allegations pertinent to harassment/hostile work environment resulting from conduct of a co-worker. The government is not, at this point in time, challenging the harassment/hostile work environment claim.

The acts which properly fall under the rubric of disparate treatment are addressed below.

        a.   <u>Segregated Route</u>

Defendants do not dispute that a less desirable work assignment could, in theory, be an adverse employment action for purposes of a disparate treatment claim. *See Humphrey v. Cty. of Nassau*, No. 06-CV-3682 (JFB) (AKT), 2009 U.S. Dist. LEXIS 27105, at *16 (E.D.N.Y. Mar. 30, 2009) (noting that "'[t]here is no exhaustive list of what constitutes an adverse employment action [and] [c]ourts have held that termination, demotion, denial of promotion, addition of responsibilities, involuntary transfer that entails objectively inferior working conditions, denial of benefits, denial of a requested employment accommodation, denial of training that may lead to promotional opportunities, and shift assignments that make a normal life difficult for the employee, among other things, constitute adverse employment actions'"). Defendants argue,

however, that there are insufficient allegations to show that she was given the less desirable work assignment *because of* her sex/gender. *Cf. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (stating that "the ultimate question [s] whether plaintiff has proved 'that the defendant intentionally discriminated against [him]' because of his race").

Defendants' position has merit. Mr. Rodriguez appears to be the supervisor who made the decision to give Ms. Potts Lindroos a segregated route. There does not appear to be any indication that Mr. Rodriguez gave Ms. Potts Lindroos this route because she is a woman. Rather, at best, the FAC essentially alleges that Mr. Rodriguez gave her this route *to retaliate* against her for having lodged a complaint about Mr. Isbell. Ms. Potts Lindroos conflates retaliation with disparate treatment.

Ms. Potts Lindroos suggests that a discriminatory motive can be inferred because she was given a segregated route and men – such as Mr. Isbell – were not.[6] *See Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000) (noting that, for a prima facie case of discrimination, a "plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably"). But there are two problems with this position.

- First, the FAC indicates that one other person was given a segregated route – Mr. Ortez, a man. Although Ms. Potts Lindroos points out that Mr. Ortez, like she, had made a complaint about Mr. Isbell (Mr. Ortez had complained to human resources), that would seem to support the theory that complainers were retaliated against – not that she was discriminated against because of her sex/gender.

- Second, it is not clear that Mr. Isbell is a proper comparator. For a disparate treatment claim, the person outside the protected class who was treated more favorably must be similarly situated. Here, Ms. Potts Lindroos and Mr. Isbell do not appear to be similarly situated – *e.g.*, she was a seasonal employee while Mr.

---

[6] Surprisingly, at the hearing, Ms. Potts Lindroos emphasized that other women were not given segregated routes as she was. This allegation, if anything, would seem to cut against sex/gender discrimination.

Isbell was a permanent employee. And there is no allegation that their duties were similar. *Cf. Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (in a case where plaintiff claimed discrimination based on a transfer to a different position and issuance of a warning letter, holding, at summary judgment, that comparator was not similarly situated to plaintiff; comparator "was not involved in the same type of offense as [plaintiff]" and further had a supervisory position "with much greater responsibility").

Accordingly, the Court dismisses the disparate treatment claim that is predicated on Ms. Potts Lindroos being assigned to a segregated route. Ms. Potts Lindroos has failed to adequately allege that the adverse employment action was taken because of her sex/gender. To the extent Defendants also move for dismissal based on administrative exhaustion, that issue is discussed below in conjunction with the retaliation claim.

> b. <u>Discouraging Return to Muir Woods</u>

As alleged in the FAC, Ms. Potts Lindroos was discouraged from returning to Muir Woods. For example, in November 2019, on her last day, Mr. Reynolds told her – after she complained about Mr. Isbell – that she should try to find work at a different location. Also, in March 2020, she was offered a new seasonal position at Muir Woods but with undesirable conditions – *e.g.*, she would not be given subsidized housing, she would not be eligible for rehire, and Mr. Isbell would still be there. (Although the FAC does not identify who offered Ms. Potts Lindroos the position in March 2020, the opposition identifies the person as Mr. Reynolds. *See* Opp'n at 19.)

It is doubtful that the alleged discouragement in November 2019 (as opposed to March 2020) was sufficiently concrete as to constitute an adverse employment action. *See, e.g.*, *Raspardo v. Carlone*, 770 F.3d 97, 125-26 (2d Cir. 2014) (stating that "'[a] plaintiff sustains an adverse employment action if he or she endures a "materially adverse change" in the terms and conditions of employment,'" and not just a "'mere inconvenience or an alteration of job responsibilities'[;] [e]xamples of actionable adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less important title, a loss of

important benefits, or significantly reduced responsibilities"). But even if it were, there are insufficient allegations that any of the above conduct was motivated by Ms. Potts Lindroos's sex/gender (as opposed to retaliation). The Court therefore dismisses this disparate treatment claim as well.

### 3. Summary

For the foregoing reasons, the Court dismisses the disparate treatment claims in Counts 1 and 2. The Court, however, shall give Ms. Potts Lindroos leave to amend. Specifically, Ms. Potts Lindroos has leave to amend the disparate treatment claims to the extent she asserts the following adverse employment actions: (1) being assigned to a segregated route and (2) being discouraged from returning to Muir Woods. She must make a prima facie case that she was subject to adverse employment action *because* of sex. Ms. Potts Lindroos is advised, however, that, should she decide to amend now, her amendment must be made in good faith and in compliance with Federal Rule of Civil Procedure 11. As the Court noted at the hearing, she has the alternative of not asserting a disparate treatment claim at this time and taking discovery instead; should that discovery reveal a basis for a disparate treatment claim, she could then move for leave to amend to add the claim back into the case.

### F. Retaliation

The elements of a retaliation claim are as follows: (1) the plaintiff engaged in a protected activity, (2) the plaintiff was subjected to an adverse employment action thereafter, and (3) a causal link exists between the two. *See O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996). "[A]n adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1237 (9th Cir. 2000).

### 1. More Definite Statement

In the instant case, Defendants initially challenge the retaliation claim by making an argument similar to that made above for the disparate treatment claim – *i.e.*, that Ms. Potts Lindroos should provide a more definite statement so that there is clarity on what the alleged adverse employment actions are in the first place. Defendants also contend that a more definite

statement is necessary because it is not even clear what the protected activity is. As above, the Court does not find Defendants' argument without basis; nevertheless, the opposition brief sufficiently fleshes out the parameters of the retaliation claim and therefore the Court proceeds to address the merits of the claim.

### 2. Alleged Retaliatory Acts

In her opposition brief, Ms. Potts Lindroos has identified the following as the alleged retaliatory acts:

- She complained about Mr. Isbell's harassment on June 10, 2019. After this complaint, Mr. Rodriguez retaliated by forcing her to "work her route by herself, without any assistance." FAC ¶ 40.

- In addition, after she complained on June 10, her coworkers were told about the complaint which led them to shun her. See FAC ¶ 39. This made her even more isolated from her coworkers as she was also placed on the segregated route. Furthermore, several months later, in October 2019, Mr. Isbell violated the no contact order (which had been put in place in response to her complaint in June) by calling her twice.

- In November 2019 (on her last day of work), she complained to Mr. Reynolds, a supervisor, that Mr. Isbell had violated the no contact order in October; part of Mr. Reynolds response was to discourage her from returning to Muir Woods. *See* FAC ¶ 50 (alleging that Mr. Reynolds told her "she should try to get a job on the south side of the Bridge").

- In December 2019 (after she had finished her season at Muir Woods), she filed a formal EEO complaint. Several months later, she was formally offered a job at Muir Woods again but it was conditioned on several unfavorable terms – *e.g.*, she would not have subsidized housing, a condition that was specific to her.

### a. Segregated Route

The first act of retaliation identified by Ms. Potts Lindroos is that she was put on a segregated route after she complained about Mr. Isbell in June 2019. Defendants argue that the

14

causal link between the protected activity and adverse employment action is not sufficiently pled – noting, *e.g.*, that it is not clear that she was put on the segregated route soon after the complaint. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (noting that circumstantial evidence on causation includes "the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision"); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (indicating that "causation can be inferred from timing alone," in particular, "where an adverse employment action follows on the heels of protected activity"). But it can reasonably be inferred that the timing was close or at least there was a "retaliatory motive" at play, *Yartzoff*, 809 F.2d at 1376, because, as alleged in the FAC, Mr. Rodriguez, a supervisor, expressly told Ms. Potts Lindroos's husband that "she'll be by herself here so no one will offend her." FAC ¶ 40.

Confronted with this problem, Defendants argue that, even if Ms. Potts Lindroos has adequately alleged retaliation here, there is an independent problem – *i.e.*, administrative exhaustion. *See Sommatino v. United States*, 255 F.3d 704, 707 (9th Cir. 2001) (stating that, "[i]n order to bring a Title VII claim in district court, a plaintiff [employed by the federal government] must first exhaust her administrative remedies"; citing 42 U.S.C. § 2000e-16(c)). According to Defendants, Ms. Potts Lindroos failed to timely exhaust on the claim that she was retaliated against by being put on the segregated route. Under federal regulations, "[a]n aggrieved person must initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). Here, Ms. Potts Lindroos first contacted an EEO counselor on December 11, 2019; thus, Defendants argue, "[a]ny matter alleged to be discriminatory that occurred more than 45 days before December 11, 2019 . . . – that is, any matter that took place before October 27, 2017 – is . . . untimely." Mot. at 13. Defendants add that, although Ms. Potts Lindroos "does not allege precisely" when she was assigned to the segregated route, it appears from the FAC that the assignment "occurred toward the beginning of her employment, or at least some point during the summer of 2019. There is no suggestion that this assignment was newly made on or after October 27 – during the last three weeks of employment." Mot. at 14. Defendants recognize that Ms. Potts Lindroos *performed* at least some of the

segregated routes on or after October 27 but maintain that the discriminatory act was the *decision* to assign her to the segregated route – "even if the consequences of the act were felt later." Mot. at 14 (citing *Del. St. Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (stating that "the only alleged discrimination occurred – and the filing limitations period therefore commenced – at the time the tenure decision was made and communicated to [plaintiff;] [t]hat is so even though one of the *effects* of the denial of tenure – the eventual loss of a teaching position – did not occur until later") (emphasis in original)).

Defendants' position on administrative exhaustion, however, is problematic – at least with respect to Ms. Potts Lindroos performing the segregated routes on or after October 27. "[I]n *Bazemore v. Friday*, 478 U.S. 385 (1986) (per curiam), . . . when considering a discriminatory salary structure, the [Supreme] Court noted that although the salary discrimination began prior to the date that the act was actionable under Title VII, 'each week's paycheck that delivered less to a black than to a similarly situated white is a wrong actionable under Title VII . . . .'" *Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 111-12 (2002). In other words, as the Supreme Court explained in *Morgan*,

> [e]ach discrete discriminatory act starts a new clock for filing charges alleging that act. . . . The existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.

*Id.* at 113; *see also Pouncil v. Tilton*, 704 F.3d 568, 583 (9th Cir. 2012) (holding that plaintiff's claims were not time barred because they were "based on an independently wrongful, discrete act in 2008, the denial of his request for conjugal visits with his second wife, . . . notwithstanding the denial, pursuant to the same regulation, of his prior request for conjugal visits with his first wife in 2002"); *Bey v. City of Oakland*, No. 14-cv-01626-JSC, 2015 U.S. Dist. LEXIS 167685, at *20 (N.D. Cal. Dec. 15, 2015) (stating that, in *Pouncil*, the Ninth Circuit held that "particular instances of allegedly discriminatory conduct that occurred pursuant to an ongoing policy qualify as discrete acts under *Morgan*").

Based on *Bazemore* and *Pouncil*, Ms. Potts Lindroos may claim that each time she

performed the segregated route on or after October 27 there was an independently wrongful violation of her rights. She need not rely on any acts that occurred prior to October 27 to establish a violation of her rights, even if the later acts were pursuant to a prior decision.

At the hearing, Defendants argued that the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), governs and not *Pouncil*. But, in *Pouncil*, the Ninth Circuit expressly took *Ledbetter* into account in reaching its holding. Moreover, *Ledbetter* recognized the continuing validity of *Bazemore*:

> when an employer adopts a facially discriminatory pay structure that puts some employees on a lower scale because of race, the employer engages in intentional discrimination whenever it issues a check to one of these disfavored employees. An employer that adopts and intentionally retains such a pay structure can surely be regarded as intending to discriminate on the basis of race so long as the structure is used.

*Id.* at 634. The *Ledbetter* Court also explained why the facts before it were different from those in *Bazemore*: the *Ledbetter* plaintiff was not asserting a *present* discriminatory pay structure but rather was claiming that she had been given poor evaluations because of her sex in the past – *i.e.*, *before* the limitations period – and that these past pay decisions continued to affect her paycheck throughout her employment. *See id.* at 622. The Supreme Court explained:

> [A] new Title VII violation does not occur and a new charging period is not triggered when an employer issues paychecks pursuant to a system that is "facially nondiscriminatory and neutrally applied." The fact that precharging period discrimination adversely affects the calculation of a neutral factor (like seniority) that is used in determining future pay does not mean that each new paycheck constitutes a new violation and restarts the EEOC charging period.

*Id.* at 637; *see also id.* at 629 (stating that plaintiff could not try to shift "the intent associated with the prior pay decisions . . . to the 1998 pay decision"; that "would shift intent from one act (the act that consummates the discriminatory employment practice) to a later act that was not performed with bias or discriminatory motive"). The instant case is more like *Bazemore* than *Ledbetter*; here, the acts which occurred within the 45 day limitations period were not neutral acts affected by a prior singular wrong, but were *in themselves* allegedly violative of law. *Cf. Morgan*, 536 U.S. as 112 (noting that discrete acts constituting an actionable independent legal wrong cannot be saved from statute of limitations under continuing violations doctrine).

To the extent Ms. Potts Lindroos tries to get in segregated routes *before* October 27, however, she does face the administrative exhaustion bar. Ms. Potts Lindroos has tried to get around the bar in two ways: (1) she, in good faith, believed that her complaint about Mr. Isbell in June 2019 was an EEO filing, *see* Opp'n at 24, and (2) the EEO Office told her in December 2019 that she had properly exhausted her claims. *See* Dimitre Decl., Ex. 1 (email, dated 12/26/2019, from EEO Office stating, "Please use this email as confirmation that you met the 45 days time frame for filing a complaint"). Ms. Potts Lindroos does not articulate what is the "legal hook" for these arguments, but she may be trying to make an estoppel claim. *See Sommatino v. United States*, 255 F.3d 704, 708 (9th Cir. 2001) (stating that "administrative exhaustion requirements under Title VII are not jurisdictional but are conditions precedent to filing an action which a defendant may waive or be estopped from asserting").

Any estoppel claim, however, does not lie. Regarding (1), Ms. Potts Lindroos has not made any allegations suggesting that Defendants led her to believe that her June 2019 complaint was an EEO complaint or that she had otherwise invoked the EEO process. *Cf. Johnson v. Henderson*, 314 F.3d 409, 415 (9th Cir. 2002) (stating that "there is no basis in law to suggest that an employee's complaints to her supervisors satisfy the requirement that the aggrieved employee seek EEO counseling prior to filing a formal complaint or suing in court"). As for (2), the Court may not take judicial notice of any email exchanges she had with the EEO Office. Furthermore, even if the Court did take the email exchanges into consideration, Ms. Potts Lindroos would not fare any better. The email from the EEO Office was issued on December 26, 2019, *after* she had already initiated contact with an EEO counselor on December 11. Thus, Ms. Potts Lindroos cannot claim that she relied on any representation in the email for not taking action *earlier* with the EEO Office.

To summarize, Ms. Potts Lindroos has adequately pled a retaliation claim based on the segregated route but part of that claim – although not all – is time barred. The claim is viable only to the extent it is based on her performance of segregated routes on or after October 27, 2019.

        b. <u>Hostile Work Environment</u>

Ms. Potts Lindroos also claims retaliation because, after she complained in June 2019,

everyone at Muir Woods was told about the complaint as a means to isolate her. She was further isolated by being placed on the segregated route. Finally, several months later, in October 2019, Mr. Isbell violated the no contact order (which had been put in place in response to her complaint in June) by calling her twice.

By the above, Ms. Potts Lindroos seems to invoke retaliation in the form of a hostile work environment. The Ninth Circuit has held that a hostile work environment may be a basis for a retaliation claim. *See Ray*, 217 F.3d at 1244-45. "Harassment . . . is the paradigm of 'adverse treatment that is based on retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Id.* at 1245. That being said, Ms. Potts Lindroos's claim of retaliatory harassment is problematic for two reasons.

First, the harassment by Mr. Isbell cannot be attributed to Defendants.[7] His unauthorized conduct is not alleged to have been created or encouraged by Ms. Potts Lindroos's supervisor in retaliation for her complaints. Furthermore, even if it could, Mr. Isbell's harassment – calling Ms. Potts Lindroos two times in October 2019 – is too far removed, in terms of time, from the June 2019 complaint. In other words, there is a causation problem. *See Gordon v. Hughes*, No. 2:13-CV-01072-JAD, 2015 WL 1549141, at *2 (D. Nev. Apr. 8, 2015) (gap of three months sufficient to support inference of causation); *Manatt v. Bank of Am., NA*, 339 F.3d 792, 802 (9th Cir. 2003) (gap of nine months insufficient to infer causation). And even if there were no causation problem, Ms. Potts Lindroos would still have to show (as with any harassment claim) that the retaliatory harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Id.* (adding that "we look to the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance'"). Moreover, Mr. Isbell's act of calling two times is neither severe (notwithstanding the no contact order) nor pervasive.

Second, with respect to ostracism from co-workers (resulting from the segregated route

---

[7] The attribution problem also plagues Ms. Potts Lindroos's claim that there was retaliation when Mr. Isbell texted her five times after she declined the Muir Woods job.

and/or their learning of her complaint against Mr. Isbell), there is again the attribution problem,
Here, there is no claim that the conduct of Ms. Potts Lindroos' co-workers was encouraged by her
supervisors in order to retaliate against her. Furthermore, there is the question of whether the
conduct was sufficiently severe or pervasive.

> "[R]udeness or ostracism, standing alone, usually is not enough to
> support a hostile work environment claim." *Carmona-Rivera*, 464
> F.3d at 19 [1st Cir.] (internal quotation marks omitted); *Brooks*, 229
> F.3d at 929 [9th Cir.] ("[B]admouthing an employee outside the job
> reference context" does not constitute an adverse employment
> action; "holding an employer liable because employees refuse to
> associate with each other might well be unconstitutional"); *Nichols*,
> 402 F. Supp. 2d at 68-69 [D.D.C.] (plaintiff could not state hostile
> work environment claim based on allegation employer pitted other
> employees against her).

*Taylor v. Contra Costa Cty. Emp't & Human Servs. Dep't*, No. 16-cv-03738-MEJ, 2017 U.S. Dist.
LEXIS 56190, at *21 (N.D. Cal. Apr. 12, 2017); *see also Manatt v. Bank of Am.*, 339 F.3d 792,
803 (9th Cir. 2003) (noting plaintiff's allegation that a senior executive "stared at [her] in an angry
way and allowed [her] co-workers to be mean to her," but stating that "[m]ere ostracism in the
workplace is not grounds for a retaliation claim"); *Brooks v. San Mateo*, 229 F.3d 917, 929 (9th
Cir. 2000) (noting that, "[b]ecause an employer cannot force employees to socialize with one
another, ostracism suffered at the hands of co-workers cannot constitute an adverse employment
action").

### 3. Discouraging Return to Muir Woods

Finally, Ms. Potts Lindroos asserts retaliation because she was discouraged from returning
to Muir Woods: (1) in November 2019 (on her last day of work), after she complained about Mr.
Isbell, she was told (by Mr. Reynolds) to consider locations other than Muir Woods and (2) in
December 2019 (after she had completed her seasonal work), she initiated contact with an EEO
counselor and then, several months later, in March 2020, was offered a position at Muir Woods
but with undesirable terms (*e.g.*, no subsidized housing).[8]

---

[8] Contrary to what the government argued at the hearing, it can reasonably be inferred from the
FAC that the undesirable term of no subsidized housing was unique to her – *i.e.*, the term was
imposed on her and not on others. *See* FAC ¶ 53 (alleging that the condition was "specific to
[her]").

Here, Defendants' argument is essentially that the above cannot constitute an adverse employment action because the conduct is "trivial" in nature – especially with respect to (1) given that she was ultimately offered a position at Muir Woods. *Brooks*, 229 F.3d at 928 (stating that "only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation"). But the standard for what constitutes an adverse employment action for purposes of a retaliation claim is relatively liberal – *i.e.*, would a reasonable employee be deterred from complaining as a result of the adverse action? *Cf. Rosenstock v. L.A. Unified Sch. Dist.*, No. CV08-6401-JWJ, 2009 U.S. Dist. LEXIS 108187, at *24-25 (C.D. Cal. July 23, 2009) (rejecting defendants' suggestion that no adverse employment action took place because plaintiff was not actually deterred from making further complaints; "defendants' argument is illogical, since by definition any person who brings a claim under Title VII for retaliation has not actually been deterred from complaining about her employer's conduct"). Given the liberal standard, there is a question of fact as to whether the conduct above could constitute an adverse employment action.

### III.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the motion to dismiss. Specifically:

- All claims against the DOI are dismissed with prejudice.

- The claim for punitive damages is dismissed with prejudice.

- The Court dismisses the disparate treatment claims but with leave to amend. Ms. Potts Lindroos may amend – if she can do so in good faith and in compliance with Rule 11 – but only with respect to the following adverse employment actions: (1) the assignment to a segregated route and (2) the discouraging of a return to Muir Woods.

- The Court dismisses the retaliation claim based on a hostile work environment with leave to amend. Ms. Potts Lindroos may proceed with the retaliation claim based on the segregated route and the discouraging of a return to Muir Woods. However, for the claim based on the segregated route, there is a partial time bar. No leave to

amend is permitted with respect to the time bar.

To the extent Ms. Potts Lindroos has asked for leave to amend to include new claims for relief – specifically, tort claims – the Court orders the parties to meet and confer.

Ms. Potts Lindroos shall file her amended complaint by July 6, 2021.  The Secretary shall file her response to the amended complaint by August 3, 2021.  If no amended complaint is filed by July 6, 2021, then the Secretary shall file her response to the original complaint by August 3, 2021.

This order disposes of Docket No. 25.


**IT IS SO ORDERED**.


Dated: June 7, 2021

_____
EDWARD M. CHEN
United States District Judge